U. S. INDUSTRIES, INC., a corporation and Diversacon Industries, Inc., a corporation, Plaintiffs,

v.

F. Browne GREGG, Defendant.

Civ. A. No. 4431.

United States District Court, D. Delaware.

Sept. 28, 1972.

1006

David A. Drexler, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for plaintiffs.

Thomas S. Lodge, and John R. Bowman, Connolly, Bove & Lodge, Wilmington, Del., and Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, Fla., for defendant.

H. James Conaway, Jr., and Ben T. Castle, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for intervenor, First National Bank of Leesburg.

## OPINION

STAPLETON, District Judge.

U. S. Industries, Inc., a Delaware corporation having its principal place of business in New York ("USI"), and Diversacon Industries, Inc., a Florida corporation having its principal place of business in Florida ("Diversacon"), instituted this action in the Court of Chancery of the State of Delaware against F. Browne Gregg, a citizen of the State of Florida. In the latter

part of 1969 USI and Gregg entered into an Agreement and Plan of Reorganization (the "Agreement"). In this Agreement USI committed itself to purchase from Gregg all of the issued and outstanding shares of capital stock of certain corporations controlled by Gregg (the "Gregg corporations") in exchange for shares of USI voting common and special preference stock. The Agreement also provided for the execution of an employment contract under which Gregg would commit himself to USI to serve as an executive of the Gregg corporations. Such a contract was entered into at the closing of the transaction on October 20, 1969. Subsequent to that closing and as contemplated by the Agreement, the businesses formerly conducted by the Gregg corporations were transferred to the plaintiff Diversacon, a wholly owned subsidiary of USI.

The complaint is divided into eight counts. Those counts set forth the following claims:

1. A common law deceit claim by USI against Gregg based on allegations that Gregg made representations of material facts which were false and misleading and omitted to state material facts necessary in order to make the statements made not misleading in order to induce USI to enter the Agreement.

2. A claim by USI against Gregg under Section 17(a) of the Securities Act of 1933 based on the same factual allegations stated in Count 1 plus the allegation that instrumentalities of interstate commerce were utilized by Gregg.

3. A common law breach of warranty claim by USI against Gregg based upon the same factual allegations contained in Count 1.

4. A claim by USI against Gregg for the impressment of constructive trust upon Gregg's USI stock based upon the foregoing factual allegations and an additional allegation that Gregg intends to sell, transfer or otherwise dispose of or encumber said stock and that this would irreparably damage USI by rendering judgment ineffectual.

5. A common law rescission claim by USI against Gregg based on the foregoing factual allegations and the assertion that USI was fraudulently induced to employ Gregg pursuant to the employment agreement.

6(a). A breach of contract claim by USI against Gregg based on an allegation that Gregg breached his commitment to devote his full business time and best efforts to the business of the Gregg corporations or any successor entity "by mismanaging Diversacon, as by, among other things, undertaking contracts on the basis of estimates of the corporations ability to complete them which he knew or should have known to be erroneous, thereby committing the corporation to contracts on terms it could not meet."

(b). A breach of fiduciary duty claim by Diversacon against Gregg based on an allegation that the same "mismanagement" constituted a breach of duty owed by Gregg as an employee of Diversacon.

7. A breach of contract claim by USI against Gregg based on an allegation that Gregg breached a covenant not to compete "in that, while in the employ of USI, Gregg bid successfully against USI for the acquisition of Can Concrete Rock Co., Inc., a Florida corporation, with actual or constructive knowledge of USI's bid."

8. A breach of contract claim by Diversacon against Gregg based on an allegation that Gregg has failed to pay Diversacon on a $500,000 note executed by Gregg in favor of the Gregg corporations, executed on October 20, 1969.

The complaint asks the following relief:

(a) Claims 1, 2 and 3—$20,000,000,

(b) Claim 4—the impressment of a trust,

(c) Claim 5—return of the compensation paid Gregg,

(d) Claims 6 and 7—unspecified compensatory damages, and

(e) Claim 8—$400,000 plus interest.

After filing its complaint, USI secured an order of the Court of Chancery

purporting to sequester all shares of common and preferred stock of USI "owned, of record or beneficially, by said defendant." The sequestrator was authorized "to seize and hold said property and any right, title or interest, legal or equitable, which" Gregg had therein.

The First National Bank of Leesburg, Leesburg, Florida, intervened in the Chancery action and moved to quash the order of sequestration on the ground that it held the "equitable ownership" of the stock as a result of a pledge thereof in December of 1971 as security for a loan. The motion to quash was argued before the Court of Chancery, but the case was removed by Gregg before any decision on that motion was handed down. Following removal, the bank renewed its motion to quash the sequestration[1] and plaintiffs moved to remand the case to the Court of Chancery. Thereafter Gregg also moved to quash the sequestration and to dismiss this action.

These motions present four issues for resolution. First, is this case properly removable under § 1441 of Title 28 of the United States Code? Second, if so, does the specific non-removal provision of the Securities Act of 1933, 15 U.S.C. § 77a et seq., prevent removal? Third, is the sequestration order, upon which the state court's jurisdiction was predicated and from whence our jurisdiction derives, valid? And, finally, if this Court has jurisdiction should any of the claims asserted be remanded to the state court?

## I. REMOVAL UNDER § 1441

In support of his removal, Gregg relies on § 1441(c) of Title 28 of the United States Code which provides:

"Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction."

Plaintiffs, in support of remand, assert that there is no "separate and independent claim or cause of action" in their complaint, "which would be removable if sued upon alone." They assert both that the complaint states no claim or cause of action which is separate and independent of the others, and, in the alternative, that if there is a separate and independent claim or cause of action its removal is barred either by want of complete diversity between adverse parties or by Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v(a), which provides in part:

" . . . No case arising under this subchapter [the Securities Act of 1933] and brought in any State court of competent jurisdiction shall be removed to any court of the United States. . . ."

■ Plaintiffs'· initial argument stresses that all claims in the complaint arise as a result of USI's acquisition of the Gregg corporations. Plaintiffs correctly assert that the diversity of legal theories supporting the various claims and the fact that each does not rest upon the identical factual allegations is not determinative.[2] Assuming, however, that all the claims here asserted do arise out of the same "interlocked series of transactions" as that phrase is used

---

1. Plaintiffs concede that the sequestration could not have seized any interest which Gregg did not possess at the time of sequestration in June of 1972 and that the bank's rights under its pledge agreement are senior. The Court has offered to amend the order of sequestration to permit the bank to exercise any of the rights given to it by the pledge agreement, including the right of sale subject to any right Gregg may have with respect to the proceeds exceeding the amount of the loan. The bank has thus far, however, asked for and received only an amendment to the order of sequestration permitting the transfer of the stock into the name of the bank on the records of the company as provided for in the pledge agreement.

2. American Fire & Casualty Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951).

in the relevant legal standard, plaintiffs' analysis ignores another equally important element in that standard.

■■ In American Fire & Casualty Co. v. Finn, 341 U.S. 6, 14, 71 S.Ct. 534, 540, 95 L.Ed. 702 (1951), the Supreme Court held that "where there is *a single wrong* to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)." It is clear from this statement, the *Finn* opinion as a whole, and the subsequent cases applying its rationale that related transactions and common questions of law or fact are not alone enough to weld claims together for the purpose of applying § 1441(c). The circumstances and character of the impact upon the plaintiff or plaintiffs are also crucial.[3] Elsewhere in its opinion the Supreme Court suggests that inquiry must be made of whether there was "a single wrongful invasion of a single primary right of the plaintiff"—"one actionable wrong" for which plaintiff "was entitled to but one recovery"— damage arising from "a single incident." 341 U.S. at 13, 16, 71 S.Ct. at 540. As will appear hereafter the second part of this test is important in the context of this case and precludes a finding that no claim asserted is separate and independent of the others.

■ I accept plaintiffs' argument that Claims 1 through 5 are not separate and independent. All of these claims allege facts occurring in connection with a single transaction and assert but a single invasion of a single right, i. e., USI's right to be free from deception in its business dealings with others. The alleged damage to USI resulted from a single incident, consummation of a fraudulently induced bargain. Korber v. Lehman, 221 F.Supp. 358 ·(S.D.N.Y. 1963).

■■ While the matter is not quite so clear, I agree with plaintiffs that Claims 6(a) and (b) are not separate and independent of each other. There is a split among the commentators as to whether plaintiffs who do not rely upon a right held jointly can ever be said to assert claims that are not separate and independent. The cases show a greater willingness to find separate and independent claims in situations where multiple plaintiffs have claims against a defendant or defendants than in situations where a single plaintiff asserts several multiple claims against a defendant or defendants. However, where the facts alleged arise out of the same transaction and damage to the respective plaintiffs is similar in kind and arises from a single incident, nothing in the *Finn* rationale would appear to dictate a holding of separate and independent claims. While the claims of the respective plaintiffs may be "separate," they are not "independent." Fugard v. Thierry, 265 F.Supp. 743 (N.D.Ill.1967); Rosen v. Rozan, 179 F.Supp. 829 (D.C.Mont.1960); Wright, Federal Courts, § 39, n. 18 (1972 Supp.); Note, 52 Columbia L.Rev. 101, 106–107 (1952).

While USI's Claim 6(b) is for breach of contract and Diversacon's 6(a) claim is for breach of fiduciary duty, both rest upon the same facts. Any injury to these plaintiffs would result from a single invasion of a same interest and would "come from a single incident." USI, as a sole stockholder of Diversacon, had an interest in the quality of the management of Diversacon which it sought to protect by contract. Any invasion of that interest would be a simultaneous invasion of an identical interest of Diversacon's. While USI might conceivably be entitled to some damage not recoverable by Diversacon, any damage would necessarily stem from injury to

3. See analysis in Mayflower Industries v. Thor Corp., 184 F.2d 537 (3rd Cir. 1950); Twentieth Century Fox Film Corporation v. Taylor, 239 F.Supp. 913 (S.D.N.Y.1965); Pinto v. Maremont Corporation, 326 F.Supp. 165 (S.D.N.Y.

1971); Greenshields v. Warren Petroleum, 248 F.2d 61 (10th Cir. 1957); Unanue v. Caribbean Canneries, Inc., 323 F.Supp. 63 (D.Del.1971); 1A Moore, Federal Practice, ¶ 0.163[4–5], pp. 708, 712–713.

Diversacon and any damage for which Diversacon recovered would not be recoverable by USI.

 Since the claims stated in Claims 1 through 5 are not removable by reason of Section 22(a) of the Securities Act[4] and the claims stated in Claims 6(a), 6(b), and 8 are not removable for want of either complete diversity or a federal claim, the crucial question becomes whether Claim 7 states a claim separate and independent of the other claims in the complaint. Plaintiffs argue that, at a minimum, Count 7 is not separate and independent of Claims 6(a) and (b). First, they suggest that Claim 7, fairly read, alleges an injury to USI through competition by Gregg with Diversacon, and that the interest allegedly invaded in that claim is the same as the common interest of USI and Diversacon allegedly invaded in Claim 6. Claim 7 in plaintiffs' view is only a particularization of the "mismanagement of Diversacon, Inc." alleged in Claims 6(a) and (b). Accordingly, plaintiffs conclude that Claim 7 is not a separate and independent claim. I do not agree with this conclusion.

Assuming that competition with USI through appropriation of a corporate opportunity of Diversacon could fairly be said to come within the conclusory allegation of "mismanagement of Diversacon,"[5] this does not answer the relevant question unless all claims against a single fiduciary for corporate mismanagement necessarily constitute non-separate, non-independent claims. I see no reason to so hold. Here as in other areas the question must be whether the facts relied upon by the pleader show separate and independent claims.

Claim 6 alleges that Gregg committed Diversacon to contracts which he knew or should have known would be non-profitable to the detriment of USI and Diversacon.[6] Claim 7, liberally construed in the context of the attachments to the complaint, alleges a claim that Gregg damaged USI by bidding for a company which competes with Diversacon.

I conclude that these are separate and independent claims. The only things which they have in common are that they arise in the context of relationships initially established in the USI acquisitions of the Gregg corporations, and, that as to USI, they allegedly constitute breaches of the same employment contract. Except for this common background, the transactions from which these claims arise are neither similar in character nor otherwise related. The alleged injuries complained of in Claims 6 and 7 do not result from a single incident or invasion. Moreover, the impact on USI and Diversacon of the Diversacon contracts referred to in Claim 6 and the impact on them of the Concrete Rock acquisition referred to in Claim 7 appear wholly unrelated in time or character. USI could recover damages for either wrong without recovering damages for the other or could recover for both without creating any problem of duplication of damages.

In view of the otherwise distinct character of these claims, the question boils down to whether breach of contract claims based on the same contract are necessarily non-separate, non-independent claims for purposes of Section 1441 (c). I have found no case which directly passes upon this question. A negative response is dictated, however, by

---

4. *Cf.* Pate v. Standard Dredging Corp., 193 F.2d 498 (5th Cir. 1952).

5. This assumption, at the least, stretches the concept of mismanagement beyond its commonly accepted scope.

6. The general allegation that Gregg has been guilty of "mismanaging" Diversacon to the extent it does more than characterize the facts alleged in this claim, is

no more than a conclusion which can and should be disregarded for present purposes. "The subject matter of the controversy is whatever the plaintiff in good faith declares it to be in his pleadings, not by conclusions of law but by well-pleaded allegations of fact." Edwards v. E. I. DuPont de Nemours & Co., 183 F.2d 165, 168 (5th Cir. 1950).

those authorities recognizing that the existence of common questions of law or fact are not alone enough to preclude removal under that section.

█ The only remaining question is whether Claim 7 is separate and independent from Claims 1 through 5 and from Claim 8. I conclude that it is. As heretofore noted, the wrong to USI in Claims 1 through 5 flowed from the consummation of a fraudulently induced bargain. It is wholly unrelated to the wrong to USI flowing from the alleged breach of the covenant not to compete and the wrong to Diversacon flowing from the alleged default on the note. While it is perhaps true that USI could not recover on its fifth claim for rescission of the employment contract and on its seventh claim for breach of the covenant not to compete, this is because the claims are legally inconsistent and not because a monetary recovery on one would compensate USI for the alleged injury arising from the other.[7]

## II. SECTION 22(a) OF THE SECURITIES ACT

The conclusion that Claim 7 is a separate and independent claim which because of diversity of citizenship would be removable if sued upon alone necessitates an examination of the relationship between § 1441(c) of Title 28 and Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

Despite the separate and independent character of Claim 7, Claim 2, arising under the Securities Act, nevertheless remains in the case. It can be argued that Section 22(a) precludes the removal of any action containing a claim under the Securities Act and that such a construction of the relevant statutes comports with the general policy favoring strict construction of the removal provisions. 1A Moore, Federal Practice, ¶ 0.157 [1.3]. The question presented by this argument appears to be one of first impression although a few cases have considered similar questions arising under statutes similar to Section 22(a) in language and purpose.

Both the Jones Act, 46 U.S.C. § 688, and the Federal Employers' Liability Act, 45 U.S.C. §§ 51–56, similarly prohibit removal of claims asserted thereunder. 28 U.S.C. § 1445(a). Since the 1948 revision of the Judicial Code and the expansive reading given to § 1441(c) by the Supreme Court in *Finn*, rarely has a court, faced with a possible conflict between § 1441(c) and the applicable non-removal provision, found a "separate and independent" claim. The question is thus avoided in the overwhelming number of reported cases.[8] There are, however, a handful of vintage district court opinions which decide that the joinder of a state law cause of action with a F.E.L.A. claim makes the whole case removable in the presence of the requisite diversity. Strother v. Union Pac. R. Co., 220 F. 731 (W.D.Mo.1915); Bedell v. Baltimore & O. R. Co., 245 F. 788 (Ohio 1917); Givens v. Wight, 247 F. 233 (N.D.Tex.1918).

---

7. Pinto v. Maremont Corporation, 326 F. Supp. 165 (S.D.N.Y.1971) is the only case found which arguably supports a conclusion contrary to the one I here reach. That case does not go as far, in my judgment, as plaintiffs suggest. The nature of the misrepresentation in the *Pinto* case is not disclosed in the opinion. However, the court's observation that "recovery could not be had under both the Securities Act claim and the contract claims," together with its reliance at this point on Korber v. Lehman, 221 F.Supp. 358 (S.D.N.Y.1963) leads me to believe the damage to the plaintiff on the misrepresentation claims and those on the contract claims was identical and recovery on either would compensate plaintiffs for the same injury.

8. See e. g., Pate v. Standard Dredging Corp., 193 F.2d 498 (5th Cir. 1952) (an action for negligence under the Jones Act and for unseaworthiness under general maritime law did not state separate and independent claims and was thus non-removable under the Jones Act). *Accord,* Gutierrez v. Pacific Tankers, 81 F.Supp. 278 (S.D.Tex.1948); Greene v. United Fruit Co., 85 F.Supp. 81 (S.D.N.Y. 1949); McKee v. Merritt-Chapman & Scott Corp., 144 F.Supp. 423 (N.D.Ill. 1956); Hall v. Illinois Cent. R. Co., 152 F.Supp. 549 (W.D.Ky.1957).

The legal theory upon which the question is there resolved is that in joining removable claims to a statutorily non-removable one the plaintiff "waived" his right to the forum of his choice. Other cases from the same period, however, refer to the statutory provisions restricting removability as "jurisdictional" and indicate that there are no circumstances under which a case falling thereunder could be removed. Mitchell v. Southern Ry. Co., 247 F. 819 (N.D.Ga.1917); Jones v. Southern Ry., 236 F. 584 (N.D. Ga.1916).

Only one modern case has squarely decided the question. In Emery v. Chicago, B. & Q. R. Co., 119 F.Supp. 654 (S.D.Iowa 1954) plaintiff pleaded a cause of action based on the Federal Employers' Liability Act and joined with it several claims based on breach of contract. The court held that the claims were "separate and independent" and the entire case was removable under § 1441 (c). The court there seemed to adopt the waiver rationale of the older cases cited above:

" . . . It rested with (plaintiff) whether he should state a cause solely under the Act and therefor not removable, or unite it with causes of action which might be removed. When he adopted the latter course, defendant then became entitled to exercise the right of removal conferred upon it by the statutes as to the causes of action properly removable. . . . " Id. at 657.

The commentators have spoken to the problem with something less than unanimity. Professor Moore in speaking of the non-removal provision of the Jones Act has said:

"Finally, there is one situation where a literal application of the removal statute would effect the removal of a Jones Act claim. Under the provisions of § 1441(c) where there is a removable separate and independent claim joined with the nonremovable Jones Act claim, the entire suit can be removed . . . " (citing Emery) 1A Moore, Federal Practice ¶ 0.167 [3.2]

Professor Cohen has taken a different view:

"Thus, it is possible, in a case where two parties are of diverse citizenship to encounter the joinder of an unremovable claim with a totally disconnected claim which would otherwise be removable. Assuming that the nonremovable claim is sufficiently substantial to pass muster under the fraudulent joinder rules, the combined force of the policies generally precluding removal of the unremovable claim and those permitting joinder argue for leaving the entire litigation in the state court." Cohen, Problems in the Removal of a "Separate and Independent Claim or Cause of Action," 46 Minn.L.Rev. 1 (1961).

I find the waiver rationale of the Emery case unpersuasive.[9] It assumes its own conclusion. The real question is whether Section 22 of the Securities Act and § 1441 reflect a congressional intent to give a claimant under the Securities Act his choice of forum even though he joins a separate and independent claim. If Congress did so intend, a Securities Act plaintiff cannot be said to have waived his right to such a joinder.

Neither do I find, as Professor Cohen suggests, that the policies underlying Section 22(a) and § 1441(c) clearly dictate an answer. Section 22(a) reflects a congressional solicitude for Securities Act claimants and grants them their choice of forum for litigating their claims. Conflicting with this policy is

9. While there is authority for the proposition that an F.E.L.A. plaintiff may waive his right to a state forum by his failure to move for remand in the federal court, Bailey v. Texas Co., 47 F.2d 153 (2nd Cir. 1931); Jacobson v. Chicago, M. St. P. & P. Ry. Co., 66 F.2d 688 (8th Cir. 1933); Woodward v. D. H. Overmeyer Co., 428 F.2d 880 (2nd Cir.), cert. denied, 400 U.S. 993, 91 S.Ct. 460, 27 L.Ed.2d 441 (1970), such a waiver should be clearly distinguished from a waiver predicated upon the joinder of claims in the state court.

the apparent two-fold purpose of § 1441 (c): (a) to assure that a defendant entitled to a federal forum for the litigation of a federal claim or a claim by a citizen of a different state will not be deprived of that right by his adversary's joinder of a non-removable, separate and independent claim and (b) at the same time to assure that all claims which should be litigated together for reasons of judicial economy be litigated in the same forum. Because of this conflict, the problem resolves itself into drawing a line where Congress intended the right granted a Securities Act claimant to cease and the protection granted defendants to commence. Congress could reasonably have drawn the line either to include or to exclude this type of case from the removable class.

The answer I believe is to be found in an analysis of § 1441.[10] This statute contains two grants of removal jurisdiction. Subsection (a) grants the general right of removal to defendants in any case that could originally have been brought in a district court of the United States. The first clause of that subsection limits this authority to cases where a contrary result has not been "otherwise expressly provided by Act of Congress." This is a clear reference to statutes like Section 22(a). Subsection (b) further limits this general removal jurisdiction in diversity cases to cases where no defendant is a resident.[11]

Subsections (a) and (c) "refer to two completely different situations." Port of New York Authority v. Eastern Air Lines, Inc., 259 F.Supp. 142, 145 (E.D. N.Y.1966). Subsection (c) grants additional removal jurisdiction in a class of cases which would not otherwise be removable under the prior grant of authority. It assumes the existence of a separate and independent claim which would not be removable under that prior grant. A literal reading of Section 1441 demonstrates that Subsection (c) is not subject to the restriction contained in the first clause of Subsection (a). Moreover, nothing in the language of Subsection (c) suggests a Congressional distinction between two classes of suits "otherwise non-removable" within the contemplation of that subsection, i. e., those non-removable because they fall completely without the original jurisdiction of the federal district courts and those which, although dealing with federal questions, are made non-removable by Congressional pronouncement.

■ I, accordingly, conclude that Section 22(a) restricts the grant of general removal jurisdiction found in Subsection (a). However, in a case where a separate and independent claim, which would be removable if sued upon

---

10. § 1441:

"(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly

joined and served as defendants is a citizen of the State in which such action is brought.

(c) Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction."

11. Because Subsection (b) is a limitation on the grant of authority contained in Subsection (a) and not a separate grant of authority, the absence of an "except as otherwise provided" claim in Subsection (b) is not significant for present purposes.

alone, is joined with one or more otherwise removable claims, whether made non-removable by Section 22(a) or otherwise, Subsection (c) is the governing provision and authorizes removal of the entire case.

## III. THE VALIDITY OF THE SEQUESTRATION

The motions to quash the sequestration assert two arguments common to both: (1) Gregg owned no sequesterable interest in the stock at the time of sequestration and (2) Delaware's sequestration statute as here applied is violative of the Due Process Clause of the United States Constitution.

Gregg executed a $1,500,000 demand note in favor of the Bank on December 28, 1971. The note reflected that the USI stock involved was pledged to secure this indebtedness and gave the Bank the right, among other things, (1) to pledge or transfer the note and collateral to any other pledgee, (2) to transfer all of the collateral to its own name or to the name of its nominee, (3) to vote the stock, (4) to direct that any dividend payments on the stock be made to it, (5) to "demand, sue for, collect or make any compromise or settlement it deems desirable with reference to the collateral," (6) to take control of any proceeds of the collateral and (7) to exercise the "remedies" of a secured party under the Uniform Commercial Code, if the Bank "deemed itself insecure or upon the occurrence of any default."

The sequestration order was served upon USI on or about June 19, 1972. The stock was then registered in the name of Gregg. As of July 27, 1972, the collateral was valued by the Bank at $2,-066,333.62.

 The loan transaction was negotiated and closed in Florida. The law of Florida determines the nature and extent of Gregg's interest, if any, in the stock.[12] The law of Delaware controls

the question of whether any such interest may be sequestered under 10 Del.C. § 366. Cheff v. Athlone Industries, Inc., 233 A.2d 170 (Del.Sup.Ct.1967); Nickson v. Filtrol Corporation, 265 A.2d 425 (Del.Ch. 1970).

An examination of Florida law reveals that Gregg had not transferred his entire interest in the stock to the Bank at the time of sequestration. The rights retained under Article 9 of Florida's Uniform Commercial Code by a debtor who has conveyed a security interest in collateral apply "whether title to collateral is in the secured party or in the debtor." 19C Fla.Stat.Ann. § 679.9–202 (West 1966). These rights include the right of return of the collateral upon fulfillment of the debtor's obligations. *Id.* § 679.9–506. This right is expressly recognized in the Gregg note; it is, in any event, unwaivable. *Id.* § 679.9–501.

The rights reserved to the debtor under Article 9 are rights in the collateral itself and may be transferred voluntarily or involuntarily. *Id.* § 679.9–311 provides:

"The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default."

 Stock in a Delaware corporation is personal property having its situs in Delaware. 8 Del.C. § 169. Accordingly, interests therein coming within the scope of 10 Del.C. § 366 are sequesterable in Delaware for the purpose of compelling the appearance of non-resident defendants. Hodson v. The Hodson Corporation, 32 Del.Ch. 76, 80 A.2d 180 (1951). Somewhat surprisingly there is no reported Delaware case directly ruling on whether one in Gregg's position has an interest sequesterable under

---

12. The relevant portions of Florida's version of the Uniform Commercial Code do

not, however, differ from those of the Delaware version.

10 Del.C. § 366.[13] I am convinced, however, that a Delaware court confronted with the question would rule in the affirmative.

Section 366 authorizes the Court of Chancery to "compel the appearance of the defendant by the seizure of all or any part of his property." The word "property" as here used has "a broad and comprehensive meaning, including legal and equitable interest in both real and personal property," and is not limited to property interests seizable by foreign attachment at law. Blumenthal v. Blumenthal, 28 Del.Ch. 1, 35 A.2d 831, 836 (1944), aff'd 28 Del.Ch. 448, 59 A.2d 216 (1945); Sands v. Lefcort Realty Corp., 35 Del.Ch. 340, 117 A.2d 365 (1955). With this understanding as a base, Delaware courts, confronted with questions of whether interests in stock were sequesterable, have asked whether the specified interest was cognizable at law or equity, whether it was susceptible of sufficient identification to permit seizure, and whether it was saleable. Blumenthal v. Blumenthal, *supra;* Greene v. Johnston, 34 Del.Ch. 115, 99 A.2d 627 (Sup.Ct.1953). Here Gregg's interest is so cognizable, so identifiable and so alienable. Accordingly, I conclude

that it is sequesterable.[14] Delaware's Uniform Commercial Code confirms this conclusion. Section 9–311 of Title 5A of the Delaware Code, like its Florida counterpart quoted above, provides that a "debtor's rights in collateral may be . . . involuntarily transferred (by way of sale . . . attachment, levy, garnishment or other judicial process)."[15]

Winitz v. Kline, 288 A.2d 456 (Del.Ch. 1971) does not dictate a contrary conclusion. In that case an order of sequestration had been entered directing the seizure of shares of a Delaware corporation "registered in the name of" the defendant Kline. Prior to the seizure, Kline and the other twenty-nine holders of the corporation's outstanding stock had entered a voting trust agreement. The certificates were surrendered by the five voting trustees to the corporation for cancellation and eight new certificates had been issued in the name of the voting trustees. Under the voting trust agreement the depositing stockholders were issued voting trust certificates. The certificates evidenced the holder's right upon termination of the trust to receive a specified number of "fully paid and nonassessable shares of the capital

---

13. There have been a number of cases where pledged stock has been sequestered, but in all to which this Court has been referred, the pledgee has apparently been content with modification of the sequestration order in a manner which recognized its senior rights.

14. "Bare legal title" (i. e., registered ownership) is sequesterable, the property being subject to release only upon a showing that its retention or sale would defeat or interfere with equitable interests therein. Rebstock v. Lutz, 39 Del.Ch. 25, 158 A.2d 487 (Sup.Ct.1960). Equitable interests of limited scope have been held to be sequesterable. In the *Blumenthal* case the plaintiff creditor had alleged that there had been a fraudulent conveyance of stock by the defendant Blumenthal to his sister, Miriam Rogers. The court held:

" . . . Miriam Rogers is the legal owner of the stock, and Blumenthal has no equitable rights therein, as between them; but it appears that the com-

plainant is a defrauded creditor who stands in a very different position. As between her and Blumenthal, the latter had property rights in the stock, subject to seizure under the statute, which enabled valid substituted service to be had on him. . . ." 35 A.2d p. 836.

The fact that an interest is contingent or unmatured does not make it non-sequesterable. Weinress v. Bland, 31 Del.Ch. 269, 71 A.2d 59 (1950).

15. Section 8–317 of Delaware's Uniform Commercial Code provides that nothing in the Code shall "amend or in any way effect" the provisions of Section 366 and that to the extent that any such provision is inconsistent with Section 366, it shall control. Arguably this might preclude reference to Section 9–311 for the purpose of defining property under Section 366. As the Study Comment on Section 9–311 indicates, however, that Section is a reflection of pre-existing Delaware law.

stock" and his right to "receive payments equal to the cash dividends received by the . . . [trustees] upon a like number of shares of capital stock of . . [the corporation], less the amount of any expense chargeable to the holder."

The Chancellor noted initially that the case was not identical to earlier Delaware cases which had held that a trustee holds the entire interest in corporate stock constituting the corpus of the trust and that the beneficiaries of the trust, while possessing an equitable interest in the trust, had no interest in the stock itself. *E. g.,* Nickson v. Filtrol Corporation, *supra.* The reason for this observation was a line of Delaware cases which state that a stockholder who deposits his stock in a voting trust retains "beneficial" ownership of the stock for some purposes. Sundlun v. Executive Jet Aviation, Inc., 273 A.2d 282 (Del.Ch.1970); Clarke Memorial College v. Monaghan Land Co., 257 A.2d 234 (Del.Ch.1969); Smith v. Biggs Boiler Works Co., 33 Del.Ch. 183, 91 A.2d 193 (1952); Chandler v. Bellanca Aircraft Corporation, 19 Del.Ch. 57, 162 A. 63 (1932). The Chancellor held, nevertheless, that the holders of the voting trust certificates in the case before him did not have a sequesterable interest in the corporate stock held by the trustees as a trust corpus.

Two reasons were cited by the Chancellor for his conclusions: (1) the order directed seizure only of common stock registered in the name of Kline and at the time of the seizure no shares were so registered and (2) any interest which Kline had in the stock was neither capable of effective seizure nor capable of being sold. In connection with the second point the Chancellor pointed out that effective seizure requires that the stock in which the defendant has an interest must be readily identifiable. Greene v. Johnston, 34 Del.Ch. 115, 99 A.2d 627 (Sup.Ct.1953). He observed that in the case before him any beneficial interest of Kline could not "be related to specific blocks of stock or lots of shares held by the trustees." The Chancellor further found that any such interest could not

be sold without disregard of the rights of third parties in the voting trust. In this connection he pointed out that while the interest evidenced by the voting trust certificates might be effectively transferred, seized and sold, the sequestration had been directed to the corporate shares and not to the voting trust certificates.

None of the deficiencies present in the *Winitz* case are present here. The sequestration order directed the seizure of shares held in the name of Gregg and shares held in the name of Gregg were seized. As indicated above, Gregg has an interest in all of those identifiable shares which is expressly made transferable, either voluntarily or involuntarily, by Section 9–311. That interest can be sold without "disregard to the rights" of the Bank.

Both Gregg and the Bank attack Delaware's sequestration statute as here applied on constitutional grounds. Gregg's attack is two-pronged. First he asserts that the sequestration of property of a non-resident defendant in a case having no substantial contact with Delaware violates due process. Additionally both Gregg and the Bank assert that the sequestration of property without prior notice and an opportunity to be heard violates due process.

Delaware's sequestration statute, 10 Del.C. § 366, authorizes the Court of Chancery, after the filing in that court of a complaint against a non-resident, to enter an order directing the defendant "to appear by a day certain to be designated." It then provides:

"The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults. Any defendant whose property shall have been so seized and who shall have entered a general appearance in the cause may, upon notice to the plaintiff, petition the Court for an order releasing such property or any part thereof from the seizure. The Court shall re-

lease such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured. If such petition shall not be granted, or if no such petition shall be filed, such property shall remain subject to seizure and may be sold to satisfy any judgment entered in the cause. The Court may at any time release such property or any part thereof upon the giving of sufficient security." [16]

Rule 4(db) of the Rules of the Court of Chancery, Del.C.Ann., which implements the provisions of the sequestration statute provides in part as follows:

"(db) Service by Publication and Seizure. (1) No order shall be entered under 10 Del.C. § 366 unless it appears in the complaint that the defendant or any one or more of the defendants is a non-resident of the State of Delaware and the application therefor is accompanied by the affidavit of a plaintiff or other credible person stating:

(a) As to each non-resident defendant whose appearance is sought to be compelled, his last known address or a statement that such address is unknown and cannot with due diligence be ascertained.

(b) The following information as to the property of each such defendant sought to be seized:

(1) A reasonable description thereof.

(2) The estimated amount and value thereof.

(3) The nature of the defendant's title or interest therein; and if such title or interest be equitable in nature, the name of the holder of the legal title.

(4) The source of affiant's information as to any of the items as to which the affidavit is made on information and belief.

(5) The reason for the omission of any of the required statements.

(2) Within three business days after the filing of such bond or bonds as may be required or within such other time as the court may fix, the Register shall, in addition to making the required publication, send by registered or certified mail to each defendant whose appearance is sought to be compelled a certified copy of the order and a copy of the pleading asserting the claim.

(3) After the filing of such bond or bonds as may be required by the order, but not later than 10 days after the date of the order of seizure, the sequestrator shall serve a certified copy of the order upon the person, persons or corporation having possession or custody of the property or control of its transfer, and shall seize the property.

. . . . .

(5) The court may in its discretion and subject to statutory requirements dispense with or modify compliance with the requirements of any part of this rule in any cause upon application to it stating the reasons therefor."

Gregg's first argument is based upon International Shoe v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny. He asserts that "under modern concepts of due process, a court cannot assert jurisdiction unless either the defendant or the subject matter of the action had at least minimal contacts with the forum."

16. Subsection (c) of Section 366 provides as follows:
"Any transfer or assignment of the property so seized after the seizure thereof shall be void and after the sale of the property is made and confirmed, the purchaser shall be entitled to and have all the right, title and interest of the defendant in and to the property so seized and sold and such sale and confirmation shall transfer to the purchaser all the right, title and interest of the defendant in and to the property as fully as if the defendant had transferred the same to the purchaser in accordance with law."

**1020**

The "minimal contacts" doctrine to which Gregg refers is not applicable where, as here, the plaintiff invokes the *quasi in rem* jurisdiction of the court. While a contrary view has been urged as the wiser one,[17] the courts have accepted the view of Justice Holmes that the "foundation of jurisdiction is physical power".[18] Just as a court may exercise *in personam* jurisdiction in a suit on a transitory cause of action where the only contact with the forum state is personal service upon the defendant within that state,[19] so also may a court exercise jurisdiction over property within its control regardless of the presence or absence of other contacts with the forum state.[20] Where the court has either of these foundations for the exercise of its power, it may constitutionally proceed, though the absence of substantial contacts with the forum may lead it to decline to do so under the familiar principles underlying the doctrine of *forum non conveniens*[21] and the federal transfer provisions of 28 U.S.C. § 1404.

The state of a corporation's domicile may constitutionally provide, as Delaware has done, that the situs of its capital stock is in its home state.[22] Thus, where the stock of a domestic corporation is brought before the court, this provides a sufficient basis for the exercise of its *quasi in rem* jurisdiction even though the defendant may be a nonresident who has had no prior contacts with the forum state. Breech v. Hughes Tool Co., 41 Del.Ch. 128, 189 A.2d 428 (Del.Sup.Ct.1963); Ownbey v. Morgan, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1920).[23]

Gregg attempts to distinguish the relevant authorities by saying that this is not in reality a *quasi in rem* action. He correctly points out that an avowed purpose of Delaware's sequestration statute is to compel a general appearance and thereby produce a basis for *in personam* jurisdiction. While the statute is concededly designed to produce this result, it does not follow that the action is not one governed by the rules applicable to *quasi in rem* jurisdiction. Unless and until the non-resident defendant elects to enter a general appearance, the power of the court is limited to the application of the property before the court to the plaintiffs' claim.[24]

The second attack on the constitutionality of Delaware's sequestration procedure is grounded on Fuentes v.

---

17. See e. g., Ehrenzweig, The Transient Rule of Personal Jurisdiction: The "Power" Myth and Forum Non Conveniens, 65 Yale L.Rev. 289 (1956); Carrington, The Modern Utility of Quasi In Rem Jurisdiction, 76 Harv.L.Rev. 303 (1962). These commentators, however, recognize the prevailing view.

18. McDonald v. Mabee, 243 U.S. 90, 91, 37 S.Ct. 343, 61 L.Ed. 608 (1915). See also Goodrich, Conflicts of Law, § 73 (1965).

19. E. g., Fauntleroy v. Lum, 210 U.S. 230, 28 S.Ct. 641, 52 L.Ed. 1039 (1908); Restatement, Conflicts of Laws, §§ 77, 78; Goodrich, Conflict of Laws, § 73 (1964).

20. *Cf.* Hanson v. Denckla, 357 U.S. 235, 246, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1957); Beal, Conflicts of Laws, §§ 106.-3, 107.3 (1935); Goodrich, Conflicts of Law, § 70 (4th Ed. Scoles 1964).

21. E. g., Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); General Foods Corp. v. Cryo-Maid, Inc., 41 Del.Ch. 474, 198 A.2d 681 (Del.Sup.Ct.1964). The cases relied upon by Gregg arise because of the difficulty of applying traditional concepts of *in personam* jurisdiction over individuals in suits against foreign corporations. Even in such cases if the corporation's activities in a state are substantial enough it is ordinarily subject to suit there on causes of action unrelated to the business conducted in the forum state. See e. g., Restatement (Second) Conflict of Laws, § 47 (1971).

22. Rogers v. Guaranty Trust Co., 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1932); Jellenik v. Huron Copper Mining Co., 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647 (1899).

23. See note 26 *infra*.

24. 10 Del.C. § 366; Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *cf.* Jacobs v. Tenney, 316 F.Supp. 151 (D.Del.1970); Restatement of Judgments, § 34 comment f (1942).

Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The reliance upon that case is misplaced.

In *Fuentes* the Supreme Court struck down Pennsylvania and Florida replevin statutes under which personal property had been seized without notice or an opportunity to be heard. The court's holding was not, however, as broad as Gregg and the Bank contend. It is significant that the court noted:

"There are 'extraordinary situations' that justify postponing notice and opportunity for a hearing. Boddie v. Connecticut, supra, 401 U.S. 371, at 379, 91 S.Ct. 780, 28 L.Ed.2d 113. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance . . .."

■ In connection with these observations the Supreme Court cited with approval Ownbey v. Morgan, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1920), describing it as a case which "involved attachment necessary to secure jurisdiction in [a] state court—clearly a most basic and important public interest." [25]

In *Ownbey* the Supreme Court rejected a constitutional attack on the exercise of *quasi in rem* jurisdiction based upon the seizure of stock in a Delaware corporation under Delaware's foreign attachment statute.[26] Under that statute, there was no pre-seizure notice or hearing. While the opinion in the *Fuentes* case should not be read as endorsing all of the views stated in the *Ownbey* opinion, *Fuentes* does indicate that seizures of the kind made here are constitutionally permissible when the tripartite test set forth there is met.

■ The Supreme Court's footnote characterization of the attachment in the *Ownbey* case supplies the answer to the initial inquiry of whether the seizure was "directly necessary to secure an important governmental or general public interest." This is not a case like *Fuentes* where the statutes allowed "summary seizure" when "no more than [a] private gain is directly at stake." Fuentes v. Shevin, *supra* at 93, 92 S.Ct. at 2000. As previously noted a state has a legitimate interest in the exercise of judicial jurisdiction with respect to property within its borders. Seizure for the purpose of securing such jurisdiction in a state court, accordingly, serves, in the words of the Supreme Court, "a most basic and important public interest." Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 1999, 32 L.Ed.2d 556, at n. 23. See also Lebowitz v. Forbes Leasing & Finance Corp., 456 F.2d 979 (3rd Cir. 1972).[27]

Was there need for prompt action? Given the nature of the interest served by the seizure, the answer here must also be in the affirmative. Notice would

25. Fuentes v. Shevin, 407 U.S. 67, 91, n. 23, 92 S.Ct. 1983, 1999, 32 L.Ed.2d 556 (June 12, 1972).

26. Although neither the Delaware court nor the United States Supreme Court considered it significant, the *Ownbey* case appears to have been a suit by non-resident plaintiffs against a non-resident defendant arising out of the latter's activities as general manager of a Delaware corporation the activities of which were limited to the States of Colorado and

New Mexico. Morgan v. Ownbey, 29 Del. 379, 6 Boyce 379, 100 A. 411 (1916).

27. Gregg and the Bank seek to distinguish *Lebowitz* on the ground that plaintiffs' cause of action there arose in the forum state. Under the rationale of the opinions in *Lebowitz*, *Fuentes* and *Ownbey*, however, this does not appear to be a relevant consideration. Moreover, there are more contacts between this litigation and the State of Delaware than were present in *Ownbey*.

afford the defendant an opportunity to defeat the state's interest in securing jurisdiction by the simple expedient of moving or transferring the property.[28] This distinguishes the present case from the situation involved in *Fuentes*. Those in possession of the property seized in *Fuentes* were subject to the *in personam* jurisdiction of the courts of Pennsylvania and Florida respectively and could be compelled to attend a hearing to make a preliminary determination of the rights in the property. The state's power to adjudicate was, accordingly, not in jeopardy. The interest served by the replevin statutes there under attack was the plaintiff's private interest in securing possession of personal property in which they claimed a possessory interest.

Finally, Delaware has kept a "strict control over its monopoly of legitimate force." The court's analysis of the Pennsylvania and Florida statutes on this point is helpful in understanding the purpose of this third requirement. The court observed:

"The statutes, moreover, abdicate effective state control over state power. Private parties, serving their own private advantage, may unilaterally invoke state power to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plain-

tiff provide any information to the court on these matters. The State acts largely in the dark."

Here, unlike *Fuentes*, the order effecting the seizure was issued by a state court judge. That judge had been supplied with a complaint and with an affidavit which revealed: (1) that Gregg was a non-resident and accordingly not subject to the *in personam* jurisdiction of the court, (2) that Gregg owned specifically described, alienable property within the State of Delaware, (3) the value of that property and (4) the source of the plaintiffs' information on these subjects. This information provided the basis for a determination that the seizure would be in furtherance of the "important public interest" underlying the sequestration statute and that prompt action would be required.[29]

■■■ It may be argued that the defendant's interest might be better protected if the statute or the rule required the issuing court to make a preliminary finding, upon the basis of an ex parte presentation, that the plaintiffs' case has some merit.[30] However, as the Supreme Court noted in *Fuentes*, the protection offered by such an ex parte determination is largely illusory. Fuentes v. Shevin, *supra*, 407 U.S. 67, at 80–82, 92 S.Ct. 1983, at 1994. I do not believe such a procedure is constitutionally required where, as here, the required presentation reveals to the issuing judge a situation where immediate seizure will serve a legitimate state interest.[31]

---

28. In the case of seizure of stock in a Delaware corporation, the latter would, of course, be the only option available for this purpose.

29. Under the Delaware practice, a court presented with a motion for the issuance of a sequestration order may also determine from the complaint whether it is "bona fide on its face," Hughes v. Trans World Airlines, Inc., 40 Del.Ch. 552, 185 A.2d 886 (1962), whether the action is of a kind where the exercise of *quasi in rem* jurisdiction is appropriate, Steinberg v. Shields, 38 Del.Ch. 349, 152 A.2d

113 (1959), and whether the value of the property to be seized bears a reasonable relation to the amount of the claim asserted. Trans World Airlines Corp. v. Hughes, 40 Del.Ch. 523, 185 A.2d 762, 765 (1962).

30. This is not required under Delaware law. Hughes v. Trans World Airlines, Inc., 40 Del.Ch. 552, 185 A.2d 886 (1962).

31. The distinction between the public interest foundation of the sequestration process and the private interest foundation of the *Fuentes* replevin statutes is reflected in the effect of the respective types

In short, this is not a situation where the State of Delaware has abdicated "effective state control over state power . . . [to] private parties serving their own private advantage . . . ". Fuentes v. Shevin, *supra*, at 93, 92 S. Ct. at 2001. The procedure here attacked serves a public purpose as part of the ordered system of conflict resolution which includes the exercise of judicial power over property located within the state. Lebowitz v. Forbes Leasing & Finance Corporation, 456 F.2d 979 (3rd Cir. 1972).

### IV. REMAND

■ Having decided that a separate and independent cause of action, removable under 28 U.S.C. § 1441(a) and (b), is stated in Claim 7, that the Court of Chancery had jurisdiction under its Order of Sequestration and, accordingly, that the derivative removal jurisdiction of this Court has been properly invoked, the Court must finally decide whether the claims "otherwise non-removable" ought to remain in this Court or, in the exercise of the discretion granted under 28 U.S.C. § 1441(c), ought to be remanded to the state court. Notwithstanding the separate and independent character of the claims asserted, I conclude that the public interest in the efficient administration of justice as well as the convenience of the parties and the witnesses will be best served by the litigation of all claims in one proceeding. See Baltimore Gas & E. Co. v. United States Fidelity & G. Co., 159 F.Supp. 738 (D.Md.1958).

The motions to remand this case and to vacate the sequestration order are denied. This Court will retain jurisdiction of the entire case and determine all issues raised.

Submit order.

of seizure. In *Fuentes* the state procedure had deprived one party of possession and had made it available to another without any determination regarding the merits of the latter's claim. In a sequestration context, the practical effect of the seizure is to immobilize the property and thereby protect the court's jurisdiction. The property may not be applied to the claim of the plaintiff until after there has been notice and an opportunity for the defendant to be heard.