U. S. INDUSTRIES, INC., a corporation,
and Diversacon Industries, Inc.,
a corporation

v.

F. Browne GREGG, Appellant.

No. 75–2177.

United States Court of Appeals,
Third Circuit.

Argued April 20, 1976.

Decided July 19, 1976.

Thomas S. Lodge, Connolly, Bove & Lodge, Wilmington, Del., for appellant; E. Earle Zehmer, Bedell, Bedell, Dittmar & Zehmer, Jacksonville, Fla., of counsel.

Morris, Nichols, Arsht & Tunnell, David A. Drexler, Wilmington, Del., for appellees; William F. Sondericker, Judith S. Kaye, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, of counsel.

Before ALDISERT, KALODNER and WEIS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Unlike 49 other states that enacted the Uniform Commercial Code, Delaware did not enact § 8–317(1)[1] which requires the actual seizure of stock certificates to effect a valid attachment or levy upon an interest in corporate stock. Rather, Delaware continued in force § 169[2] of its General Corporation Law which provides that the situs of ownership of stock in a Delaware corporation is Delaware—regardless of the actual location of the stock certificates. In contrast to the Uniform Commercial Code procedure, Delaware nonresident sequestration[3] practice permits the "seizure" of a defend-

---

1. § 8–317. *Attachment or Levy Upon Security.*

  (1) No attachment or levy upon a security or any share or other interest evidenced thereby which is outstanding shall be valid until the security is actually seized by the officer making the attachment or levy but a security which has been surrendered to the issuer may be attached or levied upon at the source.

2. 8 Del.C. § 169. *Situs of ownership of stock.*

  For all purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for the purpose of taxation, the situs of the ownership of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this State. (8 Del.C. 1953, § 169; 56 Del.Laws, c. 50.)

3. 10 Del.C. § 366. *Compelling appearance of non-resident defendant.*

  (a) If it appears in any complaint filed in the Court of Chancery that the defendant or any one or more of the defendants is a nonresident of the State, the Court may make an order directing such nonresident defendant or defendants to appear by a day certain to be designated. Such order shall be served on such nonresident defendant or defendants by mail or otherwise, if practicable, and shall be

ant's stock interest in a domestic corporation merely by giving notice to the corporation in Delaware. Seizure having been effected, Delaware case law establishes that the defendant may not appear specially to protect the seized property without subjecting himself to full *in personam* liability. *Sands v. Lefcourt Realty Corp.*, 35 Del.Ch. 340, 117 A.2d 365 (1955). The major question presented in this appeal from a default judgment approving the sale of defendant's interest in the shares of a Delaware corporation is whether the Delaware situs statute, as construed by the Delaware courts and as applied in this sequestration proceeding, comports with the constitutional requirement that jurisdiction be predicated on minimum contacts with the forum. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In our view, it does not so comport. Accordingly, we reverse and remand with a direction to dismiss for want of jurisdiction over the person.

### I.

The issue is sharply drawn in this litigation initiated by U. S. Industries, Inc. (USI), a Delaware corporation having its principal place of business in New York, and its wholly-owned subsidiary, Diversacon Industries, Inc., a Florida corporation having its principal place of business in Florida. The sole defendant is F. Browne Gregg, a Florida citizen and resident. In 1969 Gregg and USI entered into an agreement in Florida for the sale of three Florida construction companies controlled by Gregg. In essence, USI agreed to exchange USI voting common and special preference stock for the outstanding stock of the Gregg companies, the business of those companies to be transferred to USI's subsidiary, Diversacon. In addition to transferring the stock and business of his corporations, Gregg contributed $1 million to the capital of the transferred corporations and, with his wife, gave a $500,000 installment note to Diversacon. In return, Gregg received 100,962 shares of USI common stock and 8,750 shares of USI special preference stock; he was to receive additional common stock if Diversacon achieved specified levels of profitability in the future. Gregg also received an employment contract to serve as president of the transferred businesses until 1973. Gregg was removed as president in 1971 following disagreements about the operations and profitability of the acquired companies. In

published in such manner as the Court directs, not less than once a week for three consecutive weeks. The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults. Any defendant whose property shall have been so seized and who shall have entered a general appearance in the cause may, upon notice to the plaintiff, petition the Court for an order releasing such property or any part thereof from the seizure. The Court shall release such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured. If such petition shall not be granted, or if no such petition shall be filed, such property shall remain subject to seizure and may be sold to satisfy any judgment entered in the cause. The Court may at any time release such property or any part thereof upon the giving of sufficient security.

(b) The Court may make all necessary rules respecting the form of process, the manner of issuance and return thereof, the release of such property from seizure and for the sale of the property so seized, and may require the plaintiff to give approved security to abide any order of the Court respecting the property.

(c) Any transfer or assignment of the property so seized after the seizure thereof shall be void and after the sale of the property is made and confirmed, the purchaser shall be entitled to and have all the right, title and interest of the defendant in and to the property so seized and sold and such sale and confirmation shall transfer to the purchaser all the right, title and interest of the defendant in and to the property as fully as if the defendant had transferred the same to the purchaser in accordance with law. (Code 1852, § 1938; 17 Del. Laws, c. 215; Code 1915, § 3850; 34 Del. Laws, c. 216, § 2; 35 Del. Laws, c. 217; 36 Del. Laws, c. 268, § 1; Code 1935, § 4374; 10 Del.C.1953, § 366; 50 Del. Laws, c. 379, § 1.)

1972, USI (and Diversacon as a nominal plaintiff) filed an eight-count complaint against Gregg in Delaware Chancery Court claiming damages in excess of $20 million in connection with the sale.

To obtain jurisdiction over Gregg, a nonresident, plaintiffs moved *ex parte* for an order of sequestration under 10 Del.C. § 366 to seize Gregg's property in Delaware. His only property in Delaware consisted of the USI shares he had obtained in exchange for his Florida businesses. Though physically the certificates were in the First National Bank of Leesburg, Florida, where Gregg had pledged them as security for a loan, appellee contends the shares were property in Delaware because of USI's Delaware incorporation and the situs rule of 8 Del.C. § 169. Plaintiffs filed a bond in the sum of $1,000 and the state court issued the order of sequestration, the sequestrator seizing the shares by formally notifying USI of the order. The First National Bank of Leesburg then moved to intervene and quash the sequestration claiming that it owned the whole of the interest in the shares by virtue of the pledge and that Gregg had no interest to sequester. At this point, and before further action by the Delaware court, Gregg removed the case to federal court based upon diversity and $10,000 in controversy.

The proceedings in the district court were not cursory: Gregg removed the action in July, 1972, and final judgment was ordered in August, 1975. For present purposes, however, we need not trace the intricate history of the litigation below.[4] Gregg raised objections to the sequestration which were rejected, and he sought interlocutory review which was denied. Knowing he would be subject to *in personam* liability if he answered the complaint, *Sands v. Lefcourt Realty Corp., supra,* Gregg did not answer. Issues concerning damages, valuation of the stock, and the prior lien of the bank were resolved. Eventually, Gregg's stock was sold in satisfaction of the *quasi in rem* judgment of default entered against him. He appeals from the default judgment, raising four issues:

1. Whether a nonresident defendant has a sequestrable interest in Delaware corporate stock where the negotiable stock certificates have been pledged and delivered by him to a bank located outside Delaware and the defendant holds only a contingent right to the return of the certificates if and when the loan is paid in full?

2. Whether the seizure of Gregg's stock to compel his personal appearance to answer damage claims unrelated to Delaware and unrelated to his rights in the stock deprived him of due process because of the absence of minimum contacts with Delaware to sustain jurisdiction? *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

3. Whether the Delaware procedure for seizure of Gregg's stock without a pre-seizure adversary hearing deprived him of due process and equal protection rights? *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

4. Whether the denial of an opportunity to make a limited appearance, defending plaintiff's claim on the merits with any judgment limited to the value of the seized property, deprived Gregg of due process?

II.

We turn first to the non-constitutional argument. The district court found, and we agree:

The sequestration order was served upon USI on or about June 19, 1972. The stock was then registered in the name of Gregg. As of July 27, 1972, the collateral was valued by the Bank at $2,066,333.62.

4. Decisions of the district court are reported at 348 F.Supp. 1004 (D.Del.1972) and 58 F.R.D. 469 (D.Del.1973).

The loan transaction was negotiated and closed in Florida. The law of Florida determines the nature and extent of Gregg's interest, if any, in the stock. The law of Delaware controls the question of whether any such interest may be sequestered under 10 Del.C. § 366. *Cheff v. Athlone Industries, Inc.,* 233 A.2d 170 (Del.Sup.Ct.1967); *Nickson v. Filtrol Corporation,* 265 A.2d 425 (Del.Ch.1970).

An examination of Florida law reveals that Gregg had not transferred his entire interest in the stock to the Bank at the time of sequestration. The rights retained under Article 9 of Florida's Uniform Commercial Code by a debtor who has conveyed a security interest in collateral apply "whether title to collateral is in the secured party or in the debtor." 19C Fla.Stat.Ann. § 679.9–202 (West 1966). These rights include the right of return of the collateral upon fulfillment of the debtor's obligations. *Id.* § 679.9–506. This right is expressly recognized in the Gregg note; it is, in any event, unwaivable. *Id.* § 679.9–501.

The rights reserved to the debtor under Article 9 are rights in the collateral itself and may be transferred voluntarily or involuntarily. *Id.* § 679.9–311 provides:

> "The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default."

348 F.Supp. 1004, 1016 (D.Del.1972) (footnote omitted).

Having decided that Florida law determines the nature of Gregg's interest in the securities pledged to the bank, and having decided further that under Florida law Gregg had not transferred his entire interest in the stock at the time of the sequestration, the question is whether Delaware law would permit the sequestration of Gregg's interest. The district court found that Delaware law would so permit. We agree.

Our starting point is 10 Del.C. § 366 which provides that the "Court may compel the appearance of the defendant by the seizure of all or any part of his property." The word "property" has been construed by Delaware courts as having a "broad and comprehensive meaning, including legal and equitable interests in both real and personal property." *Blumenthal v. Blumenthal,* 28 Del.Ch. 1, 35 A.2d 831, 836 (Ch.1944), *aff'd* 28 Del.Ch. 448, 59 A.2d 216 (Sup.Ct.1945); *Sands v. Lefcourt Realty Corp., supra.* That an interest is contingent does not make it nonsequestrable. *Weinress v. Bland,* 31 Del.Ch. 269, 71 A.2d 59 (Ch.1950).

The district court concluded that the bank merely had a security interest in Gregg's USI stock—valued at over $2 million at the time of seizure—securing a demand note of $1.5 million. Gregg had at least two identifiable interests in the pledged stock: (a) an equitable interest in the amount by which the stock value exceeded the debt, and (b) an absolute right to discharge the bank's lien upon payment of the debt.

We agree with the district court's summary:

> Delaware courts, confronted with questions of whether interests in stock were sequestrable, have asked whether the specified interest was cognizable at law or equity, whether it was susceptible of sufficient identification to permit seizure, and whether it was saleable. *Blumenthal v. Blumenthal, supra; Greene v. Johnston,* 34 Del.Ch. 115, 99 A.2d 627 (Sup.Ct.1953). Here Gregg's interest is so cognizable, so identifiable and so alienable. Accordingly, I conclude that it is sequesterable.

348 F.Supp. at 1017.

The Delaware cases urged upon us by Gregg do not fault the reasoning of the district court nor dilute the soundness of its conclusion. Four of these were cases where an effort was made to seize property held by a legal entity in which the defendant had some interest. *Winitz v. Kline,* 288

A.2d 456 (Del.Ch.1971) (voting trust); *Nickson v. Filtrol Corp.*, 265 A.2d 425 (Del.Ch. 1970) (trust); *Cheff v. Athlone Industries, Inc.*, 233 A.2d 170 (Del.Sup.Ct.1967) (estate); *Beuchner v. Farbenfabriken Bayer Aktiengesellschaft*, 38 Del.Ch. 490, 154 A.2d 684 (Sup.Ct.1959) (subsidiary corporation). Seizure was denied in all cases, the Delaware courts having regard for the separate existence of the legal entity and the rights of its creditors and beneficiaries not involved in the litigation. The fifth case, *K–M Auto Supply, Inc. v. Reno*, 236 A.2d 706 (Del.Sup.Ct.1967), involved an attempt to attach a client's funds held by an attorney in escrow for a third party, and attachment was vacated on the ground that the client-defendant no longer had an attachable interest. We see only the most remote factual parallels between these cases and the case *sub judice*, and we perceive fundamental legal distinctions. Having in mind particularly that the interest of the third-party bank here was fully protected, we discern no reason why these cases require the conclusion that Gregg had no sequestrable interest.

■ We are satisfied that under Florida law Gregg had not relinquished his entire interest in the shares and that under Delaware law he possessed sequestrable "property" within the meaning of § 366.

### III.

We turn now to the first of Gregg's constitutional arguments: that there are no minimum contacts with Delaware upon which to predicate jurisdiction in that state. USI and Diversacon have no contacts with Delaware except for USI's incorporation in the state. The transactions giving rise to the litigation did not take place in Delaware. Gregg is not a Delaware resident, he conducts no business in that state, and he owns no property physically located there. His only contact arises by virtue of the provision of 8 Del.C. § 169 that the situs of his USI shares is Delaware. This is the *sole* nexus upon which Delaware can predicate its jurisdiction to adjudicate Gregg's rights and this, Gregg argues, is too fragile a connection to satisfy constitutional requirements.

Gregg relies upon the Supreme Court's classic formulations of the constitutional limits to state court jurisdiction.

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer*, 311 U.S. 457, 463 [61 S.Ct. 339, 85 L.Ed. 278].

. . . . .

> Whether due process is satisfied must depend . . . upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.

*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 319, 66 S.Ct. 154, 158, 160, 90 L.Ed. 95 (1945).

> [Restrictions on the personal jurisdiction of state courts] are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him.

*Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1951).

To resolve the jurisdictional question presented, we must determine (a) whether the constitutional strictures of *International Shoe* and its progeny apply to jurisdiction denominated *quasi in rem* and (b) if they do, whether the statutory situs of 8 Del.C.

§ 169, alone, is a sufficient minimum contact to support the jurisdiction here exercised.

## A.

The Delaware Supreme Court recently had occasion to consider the problem in *Greyhound Corp. v. Heitner,* 361 A.2d 225 (Del.Sup.Ct.1976), *appeal filed sub nom. Shaffer v. Heitner,* 44 U.S.L.W. 3739 (June 22, 1976) (No. 75–1812). In upholding the constitutionality of the Delaware sequestration procedure, the Delaware Supreme Court swiftly disposed of the contention that minimum contacts were lacking where jurisdiction was based on the statutory situs rule of § 169:

There are significant constitutional questions at issue here but we say at once that we do not deem the rule of *International Shoe* to be one of them. An argument based on that case was made in *Breech v. Hughes Tool Company,* 41 Del.Ch. 128, 189 A.2d 428 (1963), and rejected by this Court. Compare *Hibou, Inc. v. Ramsing,* Del.Super., 324 A.2d 777 (1974). We are not persuaded that *Breech* should now be abandoned. The reason, of course, is that jurisdiction under § 366 remains, as it was in 1963, *quasi in rem* founded on the presence of capital stock here, not on prior contact by defendants with this forum. Under 8 Del.C. § 169 the "situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . [is] in this State", and that provides the initial basis for jurisdiction. Delaware may constitutionally establish situs of such shares here, *Rogers v. Guaranty Trust Co. of New York,* 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1932); *Jellenik v. Huron Copper Min. Co.,* 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647 (1900), it has done so and the presence thereof provides the foundation for § 366 in this case. Cf. *Breech v. Hughes Tool Company,* supra. On this issue we agree with the analysis made and the conclusion reached by Judge Stapleton in *U. S. Industries, Inc. v. Gregg,* D.Del., 348 F.Supp. 1004 (1972).

361 A.2d at 229 (footnote omitted).

Concerning a possible constitutional problem in the application of § 169 to shareholders whose certificates are located outside of Delaware, the Delaware Supreme Court was similarly curt in its rejection of the argument:

Defendants argue also that the sequestration procedure is unconstitutional as applied to the interests of security holders whose certificates are located outside the State. They say that the certificates for the seized shares are physically outside Delaware and that the statutory attempt under 8 Del.C. § 169 to reserve the situs of shares here is "to indulge in a fiction."

The argument is based largely, if not exclusively, on the right of a bona fide purchaser who acquires a certificate and, so far as we are informed, there is no such purchaser among defendants. As to these defendants, we have already determined that the shares have a situs here, *Rogers v. Guaranty Trust Co. of New York,* supra; *Jellenik v. Huron Copper Min. Co.,* supra; *U. S. Industries, Inc. v. Gregg,* supra; compare *Breech v. Hughes Tool Company,* supra, and, for present purposes that is conclusive on this contention.

*Ibid.* at 236.

Because the Delaware Supreme Court accepted the rationale and conclusion of the district court, we set forth the district court's four-paragraph treatment of this subject *in toto:*

Gregg's first argument is based upon *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. He asserts that "under modern concepts of due process, a court cannot assert jurisdiction unless either the defendant or the subject matter of the action had at least minimal contacts with the forum."

The "minimal contacts" doctrine to which Gregg refers is not applicable where, as here, the plaintiff invokes the

*quasi in rem* jurisdiction of the court. While a contrary view has been urged as the wiser one,[17] the courts have accepted

[17] See e. g., Ehrenzweig, The Transient Rule of Personal Jurisdiction: The "Power" Myth and Forum Non Conveniens, 65 Yale L.Rev. 289 (1956); Carrington, The Modern Utility of Quasi In Rem Jurisdiction, 76 Harv.L.Rev. 303 (1962). These commentators, however, recognize the prevailing view.

the view of Justice Holmes that the "foundation of jurisdiction is physical power".[18] Just as a court may exercise *in*

[18] *McDonald v. Mabee,* 243 U.S. 90, 91, 37 S.Ct. 343, 61 L.Ed. 608 (1915). See also Goodrich, Conflicts of Law, § 73 (1965).

*personam* jurisdiction in a suit on a transitory cause of action where the only contact with the forum state is personal service upon the defendant within that state [19] so also may a court exercise juris-

[19] E. g., *Fauntleroy v. Lum,* 210 U.S. 230, 28 S.Ct. 641, 52 L.Ed. 1039 (1908); Restatement, Conflicts of Laws, §§ 77, 78; Goodrich, Conflict of Laws, § 73 (1964).

diction over property within its control regardless of the presence or absence of other contacts with the forum state.[20]

[20] *Cf. Hanson v. Denckla,* 357 U.S. 235, 246, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1957); Beal, Conflicts of Laws, §§ 106.3, 107.3 (1935); Goodrich, Conflicts of Law, § 70 (4th Ed. Scoles 1964).

Where the court has either of these foundations for the exercise of its power, it may constitutionally proceed, though the absence of substantial contacts with the forum may lead it to decline to do so under the familiar principles underlying the doctrine of *forum non conveniens*[21]

[21] E. g., *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *General Foods Corp. v. CryoMaid, Inc.,* 41 Del.Ch. 474, 198 A.2d 681 (Del.Sup.Ct.1964). The cases relied upon by Gregg arise because of the difficulty of applying traditional concepts of *in personam* jurisdiction over individuals in suits against foreign corporations. Even in such cases if the corporation's activities in a state are substantial enough it is ordinarily subject to suit there on causes of action unrelated to the business conducted in the forum state. See e. g., Restatement (Second) Conflict of Laws § 47 (1971).

and the federal transfer provisions of 28 U.S.C. § 1404.

The state of a corporation's domicile may constitutionally provide, as Delaware has done, that the situs of its capital stock is in its home state.[22] Thus, where

[22] *Rogers v. Guaranty Trust Co.,* 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1932); *Jellenik v. Huron Copper Mining Co.,* 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647 (1899).

the stock of a domestic corporation is brought before the court, this provides a sufficient basis for the exercise of its *quasi in rem* jurisdiction even though the defendant may be a non-resident who has had no prior contacts with the forum state. *Breech v. Hughes Tool Co.,* 41 Del.Ch. 128, 189 A.2d 428 (Del.Sup.Ct. 1963); *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1920).[23]

[23] [Incorporates note 26:]

Although neither the Delaware court nor the United States Supreme Court considered it significant, the *Ownbey* case appears to have been a suit by non-resident plaintiffs against a non-resident defendant arising out of the latter's activities as general manager of a Delaware corporation the activities of which were limited to the States of Colorado and New Mexico. *Morgan v. Ownbey,* 29 Del. 379, 6 Boyce 379, 100 A. 411 (1916).

Gregg attempts to distinguish the relevant authorities by saying that this is not in reality a *quasi in rem* action. He correctly points out that an avowed purpose of Delaware's sequestration statute is to compel a general appearance and thereby produce a basis for *in personam* jurisdiction. While the statute is concededly designed to produce this result, it does not follow that the action is not governed by the rules applicable to *quasi in rem* jurisdiction. Unless and until the non-resident defendant elects to enter a general appearance, the power of the court is limited to the application of the property before the court to the plaintiffs' claim.[24]

[24] 10 Del.C. § 366; *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *cf. Jacobs v. Tenney,* 316 F.Supp. 151 (D.Del. 1970); Restatement of Judgments, § 34 comment f (1942).

348 F.Supp. 1004, 1019–20 (D.Del.1972).

We are persuaded that the cryptic conclusions of the Delaware Supreme Court and the district court cannot survive detailed critical analysis.

### B.

The Delaware Supreme Court and the district court relied on four cases: *Rogers v. Guaranty Trust Co.*, 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1932); *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921); *Jellenik v. Huron Copper Mining Co.*, 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647 (1899); *Breech v. Hughes Tool Co.*, 189 A.2d 428 (Del.Sup.Ct.1963). For reasons we will explain, we believe that reliance on these cases was misplaced.

As a preliminary matter, the three Supreme Court cases relied on to dispose of the *International Shoe* contentions were all decided before *International Shoe.* Their precedential vitality, therefore, to rebut a minimum contacts argument would seem dubious at best. But our uneasiness with these precedents goes further. *Jellenik* was not a constitutional law case at all; it involved only the construction of a federal statute which allowed a federal trial court to bring before it absent, nonresident defendants in an action to remove encumbrances upon title to personal property "within the district where such suit is brought". Justice Harlan wrote that the "question to be determined on this appeal is, whether the stock in question is personal property within the district in which the suit was brought." And he answered the question as follows:

> Whether the stock is in Michigan so as to authorize that state to subject it to taxation as against individual shareholders domiciled in another state is a question not presented in this cause, and we express no opinion upon it. But we are of opinion that it is within Michigan for the purposes of a suit brought there against the company—such shareholders being made parties to the suit—to determine whether the stock is rightfully held by them. The certificates are only evidence of the ownership of the shares, and the interest represented by the shares is held by the company for the benefit of the true owner. As the habitation or domicile of the company is and must be in the state that created it, the property represented by its certificates of stock may be deemed to be held by the company within the state whose creature it is, whenever it is sought by suit to determine who is its real owner.

177 U.S. at 13, 20 S.Ct. at 563. Clearly, the opinion was carefully directed to the narrow statutory issue presented—whether the stock was within the district for purposes of a pure *in rem* action to determine ownership—and did not pretend to adjudicate constitutional questions or announce a constitutional rule.

Similarly, *Rogers v. Guaranty Trust Co.* was not a constitutional law case. *Rogers* was an action brought in New York state court seeking cancellation of certain shares in a New Jersey corporation authorized to do and doing business in New York as well as in New Jersey. No question of constitutional limits to jurisdiction was adjudicated. The Court made clear that *both* states were in a position to exercise jurisdiction, but directed the New York federal court to decline to exercise jurisdiction on the basis of the discretionary "settled doctrine that a court—state or federal—sitting in one state will, as a general rule, decline to interfere with or control by injunction or otherwise the management of the internal affairs of a corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile." 288 U.S. at 130, 53 S.Ct. at 297.

■ Finding no constitutional dimension to ·*Jellenik* or *Rogers*, we must disapprove reliance upon them as authority for rejecting the constitutional challenge here presented. The use of these cases as constitutional authorities is a classic example of illicit precedential inbreeding. The illegitimate conception apparently took place in *Breech v. Hughes Tool Co.*—the keystone of the *Greyhound* opinion on this issue. At issue in *Breech*, as here, was a federal constitutional challenge to the Delaware stock seizure practice. As here, plaintiff argued that there were no minimum contacts to

justify *quasi in rem* jurisdiction. The Delaware Supreme Court met the argument thus: "This argument is interesting, but is clearly unsound under settled principles of law." 189 A.2d at 431. The settled principles of law consisted of the Delaware statutes, *Jellenik* and *Rogers*. The court's entire discussion on this issue is set forth in the margin.[5] The inbreeding continued in the district court, reliance being had on the precedent of *Breech* as well as *Jellenik* and *Rogers*. Finally, in *Greyhound*, the Delaware Supreme Court was in a position to state that it was "not persuaded that *Breech* should be abandoned," citing a line of cases: *Jellenik*, *Rogers*, and the district court opinion in this action. We cannot accept the notion that the mere proliferation of unwarranted reliances on old cases suffices to settle a contemporary issue in a dynamic field of law.

### C.

Like *Jellenik, Rogers,* and *Breech, Ownbey v. Morgan,* the fourth case, does not dictate the outcome of this litigation. *Ownbey,* however, deserves separate consideration. Challenged in *Ownbey,* and sustained by the Supreme Court, was a former Delaware statutory requirement that a defendant put up a "special bail" in a foreign attachment suit in order to be allowed to appear and defend on the merits. Ownbey was unable to put up the bail and a default judgment was entered against him. The *Ownbey* Court apparently rested its deci-

---

**5.** *Second.* Breech raises a constitutional question. He argues in effect that his Ford Motor Company stock has no situs in Delaware justifying the seizure. Since it is intangible property, it has a situs only by legal fiction; therefore the selection of a situs for intangibles must be one that embodies a "common sense appraisal of the requirements of justice and convenience in particular conditions." Per Cardozo, J., in *Severnoe Securities Corp. v. London & Lancashire Ins. Co.*, 255 N.Y. 120, 123–124, 174 N.E. 299, 300. Breech analogizes this test to the federal test respecting the subjection of a foreign corporation to the jurisdiction of a state, i. e. a test based on "minimum contacts" with the state of the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 158, 90 L.Ed. 95.

Breech insists that if such a test be applied here, Delaware has no jurisdiction to seize his stock. There are no sufficient "contacts", he says, between the seized shares and the claim asserted by Toolco to justify *quasi in rem* jurisdiction. Hence the seizure should be vacated.

This argument is interesting, but is clearly unsound under settled principles of law. The seized shares have a Delaware situs because the Ford Motor Company is a Delaware corporation and the corporation law to which it owes its existence provides expressly that the situs of ownership of stock of all such corporations, for "all purposes of title, action, attachment, garnishment and jurisdiction of all courts in this State" shall be regarded as in this State. 8 Del.C. § 169.

In *Jellenik v. Huron Copper Mining Co.,* 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647, the Supreme Court of the United States upheld the right of the State of Michigan to determine ownership of shares of stock of a Michigan corporation. The court quoted the provisions of the Michigan statute, including provisions for attachment of the stock, and said:

"The authority of the state to establish such regulations in reference to the stock of a corporation organized and existing under its laws cannot be doubted." 20 S.Ct. 563.

And see *Rogers v. Guaranty Trust Co.,* 288 U.S. 123, 53 S.Ct. 295, 298, 77 L.Ed. 652.

The attachment of stock of Delaware corporations, without seizure of the certificate representing the shares, upon the theory that the stock has a statutory situs here, has existed since at least 1852 (Code, § 1253). The "situs" section cited above (§ 169), stems from the corporation law of 1899. 21 Del.L. c. 273, § 128. These statutes thus embody a settled Delaware policy, and the court may not overturn it on the basis of a suggested federal rule that has never been announced.

The weakness of Breech's contention is exposed by his concession that the attachment of Hughes' stock in "Toolco" was legal "because of the intimate relationship between the stock and cause of action alleged by plaintiff TWA." We have considerable difficulty in following this distinction. The primary purpose of the seizure is to compel appearance in a law suit, and to this purpose neither the nature of the property seized nor its incidental connection with the law suit seems material.

We are of opinion that the seizure was a constitutional exercise of power. 189 A.2d at 430–31.

sion on a theory of implied consent as well as on the historical and customary validity of the practice in issue:

> [A] property owner who absents himself from the territorial jurisdiction of a state, leaving his property within it, must be deemed *ex necessitate* to consent that the state may subject such property to judicial process to answer demands made against him in his absence, according to any practicable method that reasonably may be adopted. A procedure customarily employed, long before the Revolution, in the commercial metropolis of England, and generally adopted by the States as suited to their circumstances and needs, cannot be deemed inconsistent with due process of law, even if it be taken with its ancient incident of requiring security from a defendant who after seizure of his property comes within the jurisdiction and seeks to interpose a defense.

256 U.S. at 111, 41 S.Ct. at 438.

We recognize that there is disagreement about the continued vitality of *Ownbey* as measured by contemporary standards. In relying on the historical validity of the practice, *Ownbey* ignored the fact that state procedures had no due process significance prior to the 1868 adoption of the Fourteenth Amendment. Moreover, the Supreme Court, more recently, has tartly reminded that "[t]he fact that a procedure would pass muster under a feudal regime does not mean it gives necessary protection to all property in its modern forms." *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1960). Judge Gibbons has concluded that "[i]t is inconceivable that *Ownbey* would be decided today as it was decided in 1921." *Jonnet v. Dollar Savings Bank*, 530 F.2d 1123, 1136 (3d Cir. 1976).

It is contended, however, that *Ownbey* survives with full vigor because it has been recently cited by the Supreme Court. The contention merits analysis. In *Fuentes v. Shevin*, 407 U.S. 67, 91, 92 S.Ct. 1983, 1999, 32 L.Ed.2d 556 (1972), the Supreme Court cited *Ownbey* to support this statement:

Only in a few limited situations has this Court allowed outright seizure [23] without

> [23] Of course, outright seizure of property is not the only kind of deprivation that must be preceded by a prior hearing. See, *e. g.*, *Sniadach v. Family Finance Corp., supra*. In three cases, the Court has allowed the attachment of property without a prior hearing. In one, the attachment was necessary to protect the public against the same sort of immediate harm involved in the seizure cases—a bank failure. *Coffin Bros. & Co. v. Bennett*, 277 U.S. 29 [48 S.Ct. 422, 72 L.Ed. 768]. Another case involved attachment necessary to secure jurisdiction in state court—clearly a most basic and important public interest. *Ownbey v. Morgan*, 256 U.S. 94 [41 S.Ct. 433, 65 L.Ed. 837]. It is much less clear what interests were involved in the third case, decided with an unexplicated *per curiam* opinion simply citing *Coffin Bros.* and *Ownbey*. *McKay v. McInnes*, 279 U.S. 820 [49 S.Ct. 344, 73 L.Ed. 975]. As far as essential procedural due process doctrine goes, *McKay* cannot stand for any more than was established in the *Coffin Bros.* and *Ownbey* cases on which it relied completely. See *Sniadach v. Family Finance Corp., supra*, [395 U.S.] at 340 [89 S.Ct. 1820]; *id.*, at 344 [89 S.Ct. 1820] (Harlan, J., concurring).

opportunity for a prior hearing.

Two years later, *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 613–14, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1972), mentioned *Ownbey* in the context of determining whether the petitioner in the case was entitled to a hearing before seizure. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 n.13, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), cited *Ownbey* in a discussion of considerations that justify postponement of notice and hearing until after seizure. Similarly, in *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 610, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), *Ownbey* was cited as an instance where the Court had "approved prejudgment attachment liens."

Our review of these cases convinces us that, at the most, *Ownbey* has been cited by the Supreme Court from 1972 to 1975 to illustrate the few limited situations in which the Court historically has permitted seizure of property without opportunity for a prior hearing. Whether the case retains vitality for more than that seems here a moot issue. The brute fact is that *Ownbey* adjudicated the constitutionality of a statutory procedure since abandoned. While the

case, incidentally, did involve the seizure of stock, it did not adjudicate the question of *situs*; and certainly it did not anticipate the minimum contacts doctrine of *International Shoe*.[6] *Ownbey* did, however, rely in part on the ancient distinction between actions *quasi in rem* and actions *in personam* —the distinction which formed the major premise of the Delaware Supreme Court's truncated analysis in *Greyhound Corp. v. Heitner, supra*. We turn now to an analysis of that distinction in the context of this case.

## IV.

We begin our inquiry into the constitutional dimensions of *quasi in rem* jurisdiction by conceding that the minimum contacts language of *International Shoe* was expressly made applicable to the exercise of jurisdiction *in personam*. Subsequent cases, however, have made it clear that ancient labels do not control the content of constitutional guarantees. Referring to the distinction between *in rem, quasi in rem,* and *in personam* actions, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 312, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950), emphasized that "the requirements of the Fourteenth Amendment to the Federal Constitution do not depend upon a classification for which the standards are so elusive and confused generally and which, being primarily for state courts to define, may and do vary from state to state." Later, *Hanson v. Denckla,* 357 U.S. 235, 246, 78 S.Ct. 1228, 1235, 2 L.Ed.2d 1283 (1958), articulated the constitutional requirement in terms of *affiliating circumstances*[7] "without which the courts of a State may not enter a judgment imposing obligations on persons (jurisdiction *in personam*) or af-

fecting interests in property (jurisdiction *in rem* or *quasi in rem*)."

*Hanson* involved, *inter alia,* an attempt by Florida to exercise jurisdiction over trust assets in Delaware based upon the fact that the settlor-decedent had established a Florida domicil after executing the trust. Having made clear in a footnote that it was using "*in rem*" in lieu of "*in rem* and *quasi in rem,*" 357 U.S. at 246 n. 12, 78 S.Ct. at 1235, the Court had this to say generally about such jurisdiction:

> Founded on physical power, *McDonald v. Mabee,* 243 U.S. 90, 91, [37 S.Ct. 343, 61 L.Ed. 608], the *in rem* jurisdiction of a state court is limited by the extent of its power and by the coordinate authority of sister States. The basis of jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State. *Rose v. Himely,* 4 Cranch 241, 277 [2 L.Ed. 608]; *Overby v. Gordon,* 177 U.S. 214, 221–222 [20 S.Ct. 603, 44 L.Ed. 741]. Tangible property poses no problem for the application of this rule but the situs of intangibles is often a matter of controversy.

357 U.S. at 246–47, 78 S.Ct. at 1236 (footnote omitted). Finding it essential to scrutinize the affiliations that might justify Florida's exercise of jurisdiction, the Court concluded: "For the purpose of jurisdiction *in rem* the maxim that personalty has its situs at the domicil of its owner is a fiction of limited utility. *Green v. Van Buskirk,* 7 Wall. 139, 150 [19 L.Ed. 109]. The maxim is no less suspect when the domicil is that of a decedent. . . . The fact that the owner is or was domiciled within the forum State is not a sufficient affiliation with the property upon which to base jurisdiction *in rem*." 357 U.S. at 249, 78 S.Ct. at 1237.

**6.** In *Fuentes,* the Supreme Court mentioned *Ownbey* as involving an attachment "necessary to secure jurisdiction." It is worth remembering that *Ownbey* was decided before *International Shoe* stimulated the enactment of long arm statutes. When *Ownbey* was decided, attachment was often necessary to secure jurisdiction (*quasi in rem*) over a nonresident defendant; today, at least if there are minimum contacts, full *in personam* jurisdiction can usually be obtained under a long arm statute. Ar-

guably, then, the need to secure jurisdiction that justified *Ownbey* is now fully met by long arm jurisdiction, and could no longer serve to support the harsh result in that case.

**7.** Apparently the phrase was suggested by Professor E. R. Sunderland. See Sunderland, *The Problem of Jurisdiction,* 4 Texas L.Rev. 429 (1936), reprinted in Selected Essays on Constitutional Law, Book 3, 1270, 1272 (1938).

We can only understand *Mullane* and *Hanson* as establishing a constitutional limit to state court jurisdiction wholly independent of the label—*in rem, quasi in rem, or in personam*—that may be affixed to that jurisdiction. And whether it be called affiliating circumstances or minimum contacts,[8] we must assume that ultimately the test of *International Shoe* is determinative: that there be sufficient connection with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158.

Judge Gibbons calls the problem here the "bifurcation of *International Shoe's* jurisdictional doctrine." *Jonnet v. Dollar Savings Bank,* 530 F.2d 1123, 1132 (3d Cir. 1976). He has placed the matter in proper perspective, chronologically and jurisprudentially:

The analytical point of departure for those cases which have sustained against jurisdictional challenge foreign attachment procedures has traditionally been a quartet of Supreme Court cases reviewing judgments of state courts: *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877); *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905); *Pennington v. Fourth National Bank,* 243 U.S. 269, 37 S.Ct. 282, 61 L.Ed. 713 (1917); *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921). See, e. g., *Steele v. G. D. Searle & Co.,* 483 F.2d 339 (5th Cir. 1973), *cert. denied,* 415 U.S. 958, 94 S.Ct. 1486, 39 L.Ed.2d 572 (1974). All of these cases were decided before the Supreme Court in *International Shoe* redefined the due process limitations upon the exercise of judicial power over disputes foreign to the forum. All were decided before the Supreme Court in the escheat cases recognized that there are due process limitations upon the power of a state which has permitted a corporation chartered by it to do business, issue securities and incur debts beyond its borders to insist upon the fiction of a local situs for its securities and debts. *Western Union Telegraph Co. v. Pennsylvania,* 368 U.S. 71, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961); *Texas v. New Jersey,* 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1964), 380 U.S. 518, 85 S.Ct. 1136, 14 L.Ed.2d 49 (1965). No Supreme Court case has actually considered the due process issues tendered by this appeal, since the constitutional interpretations which raise them had not yet been made at the time either *Pennoyer v. Neff* or *Ownbey v. Morgan* was decided.

530 F.2d at 1131–32. Judge Gibbons' analysis, a scholarly, carefully documented history of *quasi in rem* foreign attachment in the federal courts, develops a thesis to which we perceive no effective rebuttal. "Although it can be argued," he concludes, "that the content of constitutional process due a litigant defending title to property will vary from that due a litigant defending himself from liability in personam, there is no reason to believe that the Supreme Court presently recognizes such a distinction. . . . In short, the same limitations of fundamental fairness apply to any exercise by the state of judicial powers, whether that exercise be denominated in rem, quasi in rem or in personam. One of those limitations . . . is the *International Shoe* rule." *Ibid.* at 1136–37. We agree.

Our conclusion that *International Shoe* applies to *quasi in rem* actions is contrary to the district court's statement that "[t]he 'minimal contacts' doctrine to which *Gregg* refers is not applicable where, as here, the plaintiff invokes the *quasi in rem* jurisdiction of the court." 348 F.Supp. at 1020. Our conclusion also severely erodes the foundation of the Delaware Supreme Court's truncated analysis in *Greyhound Corp.* that *International Shoe* did not apply because "jurisdiction under § 366 remains, as it was in 1963, *quasi in rem* founded on the presence of capital stock here." 361 A.2d at 229. Far from ending the constitutional inquiry, we believe that the *quasi in rem* character of the jurisdiction constitutes

---

**8.** In *Hanson,* the Supreme Court used the phrases interchangeably, evidently attributing the same constitutional content to both. See 357 U.S. at 250, 251, 78 S.Ct. 1228.

the analytical beginning point for the application of constitutional precepts to the case.

## V.

We must decide whether the single fact of statutory situs of stock under 8 Del.C. § 169 suffices to give Delaware sufficient contact or affiliation with this litigation to satisfy constitutional standards. In our view, it does not.

We do not exaggerate in saying that § 169 is the single affiliation with Delaware in this case. The cause of action did not arise in Delaware. The defendant is not a citizen or resident of Delaware; he conducts no business in the state and owns no property physically located there. His sole contact is his interest in shares of USI represented by certificates located in Florida. The plaintiffs' connections with Delaware—insofar as that may be relevant[9]—are similarly sparse. Diversacon has no connection whatsoever: it is a Florida corporation having its principal place of business in Florida. USI is incorporated in Delaware but has its principal place of business in New York; it owns no property[10] and maintains no business establishments in Delaware other than a registered agent's office as required by statute.

Because even the *plaintiffs* here cannot with reason be characterized as residents of Delaware, *Minichiello v. Rosenberg,* 410 F.2d 106 (2d Cir. 1968), *aff'd on rehearing in banc,* 410 F.2d 117, *cert. denied,* 396 U.S. 844, 90 S.Ct. 69, 24 L.Ed.2d 94 (1969), provides no precedential support for sustaining jurisdiction here. In *Minichiello,* the majority seemed to uphold the constitutionality of *Seider v. Roth,* 17 N.Y.2d 111, 269 N.Y. S.2d 99, 216 N.E.2d 312 (1966), on the basis that the *Seider* procedure (a judicially created direct action against liability insurance

carriers) would be available only for New York resident plaintiffs or plaintiffs injured in New York. The limitation to New York residents was affirmed in *Farrell v. Piedmont Aviation, Inc.,* 411 F.2d 812 (2d Cir.), *cert. denied,* 396 U.S. 840, 90 S.Ct. 103, 24 L.Ed.2d 91 (1969), Judge Friendly observing that "the constitutional doubt with respect to applying *Seider v. Roth* in favor of nonresidents would be exceedingly serious" and that the "doubt arises from New York's lack of meaningful contact with the claim." *Ibid.* at 817. In *Farrell,* the formality of appointing a New York administrator of a nonresident decedent's estate did not supply the necessary meaningful contact with New York. As in *Farrell,* it would seem that the plaintiffs' contacts with the forum here are more formal than meaningful, at least in constitutional terms.

Indeed, it is difficult to imagine how litigation implicating a Delaware corporation could have fewer or less meaningful contacts with the state. The brute fact is that USI's Delaware incorporation is the only genuine contact this litigation has with Delaware. It is our view that, under these circumstances, the fictional § 169 situs of stock in Delaware does not pass constitutional muster as a predicate for jurisdiction in an action admittedly seeking to obtain personal liability of a nonresident in connection with transactions unrelated to the forum.

Again, we are impressed by Judge Gibbons' analysis:

As a metaphysical exercise it may be asserted that since the very existence of the corporations is dependent upon state law, state law should be regarded as supreme in defining the situs of intangibles resulting from such corporate existence. But the state has permitted the corpora-

9. It can plausibly be argued that a plaintiff's contacts with the forum are irrelevant for jurisdictional purposes. *Jonnet v. Dollar Savings Bank, supra,* 530 F.2d at 1141 (Gibbons, J., concurring). *Contra, Farrell v. Piedmont Aviation, Inc., infra.* We need not reach the issue, however, because here the plaintiffs' contacts with the forum are insufficient even assuming their relevance.

10. The absence of plaintiffs' assets in the state distinguishes this case from *Baker v. Gotz,* 492 F.2d 1238 (3d Cir. 1974) (in banc), *aff'g mem. by an equally divided court* 336 F.Supp. 197 (D.Del.1971), *cert. denied,* 417 U.S. 955, 94 S.Ct. 3084, 41 L.Ed.2d 674 (1974). In *Baker,* the plaintiff railroad corporation, although a Pennsylvania corporation, did business and had substantial assets in Delaware.

tions to stray far from its boundaries, and to issue intangibles without its jurisdiction. New Jersey once contended that since it issued a corporation's charter, it could determine the situs of intangibles in an in rem proceeding. The Supreme Court rejected this contention in *Texas v. New Jersey, supra.* Justice Black's opinion recognized that a local contacts analysis suggested by *International Shoe* and *Mullane v. Central Hanover Bank & Trust Co.* would be unworkable in escheat cases, because more than one jurisdiction might have contacts minimally sufficient to support the exercise of adjudicatory authority over the dispute. Nevertheless, he rejected the fictionalized situs approach, announcing instead a rule favoring the state of the last known address of the creditor. There is no more justification for recognizing state notions of fictionalized situs of corporate intangibles in a *quasi-in-rem* case than in an escheat case. Indeed, the state's interest in a fictionalized local situs is stronger in the escheat case, where it is at least acting in its own interest rather than on behalf of a private litigant.

*Jonnet, supra,* 530 F.2d at 1139.

█ Considering the factors that might properly qualify as affiliating circumstances to support jurisdiction, *Hanson v. Denckla, supra,* gave short shrift to the proposition that the situs of personalty is the owner's domicil: "For the purpose of jurisdiction in rem the maxim that personalty has its situs at the domicil of its owner is a fiction of limited utility." 357 U.S. at 249, 78 S.Ct. at 1237. We see no more jurisdictional [11] utility to the fiction that the corporation's domicil—the state of incorporation—is the situs of its stock. In *Texas v. New Jersey,* 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965), New Jersey argued that the state of incorporation of a debtor corporation ought to have the power to escheat an abandoned debt. Justice Black answered: "[I]t seems to us that in deciding a

question which should be determined primarily on principles of fairness, it would too greatly exalt a minor factor to permit escheat of obligations incurred all over the country by the State in which the debtor happened to incorporate itself." *Ibid.* at 680, 85 S.Ct. at 630. Here too we apply "principles of fairness" and see no reason to "exalt a minor factor."

While the focus of our attention has been the situs provision of § 169, the result we reach is buttressed by the operation in this case of the rule of *Sands v. Lefcourt Realty Corp., supra.* Under the interpretation that case gave to the statutory schema, the nonresident defendant is inexorably put to a Hobson's choice: either surrender by default the entire value of the seized property or submit to *in personam* jurisdiction. Keeping in mind the admonition of *Mullane* that constitutional standards do not depend on "elusive and confused" state law classifications, we wonder whether this jurisdiction realistically ought to be considered as *quasi in rem.* The purpose of the Delaware procedure is to coerce the nonresident to submit to *in personam* jurisdiction. And it is difficult to conceive of a more potent jurisdiction—irrespective of its label—than the jurisdiction exercised here. Unless Gregg chose to default the $2 million in stock certificates he could have been held personally to answer for a claim in excess of $20 million in a forum unrelated to him or the transaction at issue. Of course, if this case were analyzed under an *in personam* rubric, the conclusion we have reached would follow just as surely.

Having been persuaded that the statutory situs of stock in Delaware under 8 Del.C. § 169 was an insufficient contact with the state constitutionally to support the jurisdiction here exercised, and that Gregg is entitled to relief on that basis, it is not necessary to meet Gregg's other constitutional contentions.

The judgment of default entered by the district court will be reversed and the pro-

---

11. We readily concede that the law of the state of incorporation might be a critical, even controlling, factor for choice of law purposes. But

questions of constitutional jurisdiction we believe are wholly different from choice of law issues.

ceedings remanded with a direction to dismiss the complaint for want of jurisdiction over the person.